## CONESTOGA CIGAR CO. v. CHAS. FINKE ET AL.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS
OF LANCASTER COUNTY.

Argued May 19, 1890.
Re-argued May 19, 1891—Decided October 5, 1891.
[To be reported.]

(*a*) Plaintiff bought cases of tobacco from a dealer, on samples, each sample having an inscription of the following form: "Stripped and sample warranted: No. 408. Feb. 5th, 1887. 484 lbs. and 84 off. Not responsible for any change or damage occurring after inspection. Charles Finke & Co., Inspectors, 149 Water St., N. Y."

(*b*) Some of the tobacco was found to be damaged, when examined. The plaintiff notified the vendors, who notified the inspectors; and subsequently the latter, by their agents, examined the tobacco, directed the plaintiff to ascertain and separate the damaged portion, and promised that they would pay the plaintiff for it:

1. On the trial of an action against the inspectors to recover for the tobacco damaged, the words and figures of the inscription being of themselves unintelligible without explanation it was proper to admit parol evidence as to their meaning as understood and acted upon by those engaged in the tobacco trade.

(*c*) That evidence was to the effect that, in the general usage of that trade, the inscription was held to be a warranty on the part of the inspectors, engaged in the business of inspecting tobacco for dealers in consideration of the fees paid, that the tobacco was sound; such warranty running in favor of any future purchaser thereof:

2. Whether such usage of the trade to hold the inspectors responsible on their warranty, was of such long continuance as to have become obligatory as a trade custom, or not, the acts of the defendants in this case gave a construction of the inscription in accordance with the usage, and authorized a recovery against them.

Argued before PAXSON, C. J., STERRETT, GREEN, CLARK and McCOLLUM, JJ.; re-argued before a full Bench.

No. 88 January Term 1890, Sup. Ct.; court below, No. 58 May Term 1888, C. P.

On May 4, 1888, an appeal was entered from the judgment of a justice of the peace for $206.11 in favor of the Conestoga Cigar Co. against "Charles Finke & Co., F. Schroeder and J.

C. Irwin, agents," the plaintiff filing a statement of claim as follows:

" The claim or statement of demand of the plaintiff above is founded on a contract whereby the defendants, being inspectors of leaf tobacco and having an office in the city of Lancaster, did on the fifth day of February, A. D. 1887, in the county of Lancaster, inspect a certain lot of leaf tobacco and place the official mark of the firm upon samples drawn from each case of tobacco; by which means defendants guaranteed with all purchasers of said leaf tobacco the character, quality and degree of fineness of such case so inspected by them, and that it should not be inferior in anywise to the sample containing their official guaranty as inspectors of leaf tobacco.

" The said leaf tobacco, after having been so inspected, came into the control of B. S. Kendig & Co., of Lancaster, together with the samples aforesaid, who, on the twenty-seventh day of July, A. D. 1887, offered the same for sale by samples to the plaintiff; and the plaintiff, relying on the guaranty given by defendants on the samples presented to them, then and there purchased of the aforesaid inspected tobacco three thousand five hundred and eighty-nine pounds, it to be as samples, paying therefor ten and one half cents per pound, or the sum of three hundred and seventy-six $\frac{84}{100}$ dollars for this lot.

" When in truth and fact the said tobacco was not then and never had been of the character, quality or fineness of the samples, but was inferior; whereby, an action hath accrued to plaintiff against defendants to recover all damages sustained by plaintiff against defendants, which damages plaintiff avers to be the sum of two hundred and six dollars, with interest from November the twenty-seventh, A. D. 1887. And therefore it brings this suit."

The defendants pleaded non-assumpsit.

At the trial, on October 17, 1889, the plaintiff, a corporation doing business at Lancaster city, showed that in July, 1887, the company bought ten cases of tobacco from B. S. Kendig & Co.; that the tobacco was bought "on the samples," and when it was opened and examined 1,963 pounds of it were found to be damaged; and that when purchased, each case was represented by a sample corresponding in number with the number of the case, and upon the sample was a sampler's tag, with the sampler's seal and the following legend, or one like it:

" Stripped and sample warranted.　No. 408.　Feb. 5th, 1887. 484 lbs. and 84 off.　Not responsible for any change or damage occurring after inspection.　Chas. Finke & Co., Inspectors, 149 Water Street, New York.　Frank Ruscher, John T. Mellor. Jr."

That, upon discovering that the tobacco was damaged, the plaintiff notified B. S. Kendig & Co., from whom it had been purchased, and that afterward J. C. Irwin, one of the defendants, came; that Irwin told the company " we should clean the tobacco out, keep the bad tobacco separate, and that they would pay for the tobacco, what was damaged;" that subsequently F. Schroeder and Mr. Irwin came together, for the purpose of sorting the tobacco : " They consulted together a little and then went away."

D. Giles Kendig, of B. S. Kendig & Co., called for plaintiff, testified that the witness's firm were dealers in leaf tobacco at Lancaster city, and sold ten cases to the plaintiff company in July, 1887, by sample; that in sampling, the box is turned off the tobacco, samples of it taken from several places and tied in a bunch, and that constitutes the sample; that each case being numbered, the corresponding number is placed on the tag, and on the tag the date of the sampling, the gross weight and tare, and a seal is placed, the seal of the firm who sample the tobacco. The witness testified, further, that Mr. Schroeder and Mr. Irwin, defendants, were the recognized agents at Lancaster of Charles Finke & Co., tobacco samplers at New York; that Mr. Schroeder and also Mr. Irwin had paid witness's firm money for damaged tobacco found in cases they had bought by Charles Finke & Co.'s tag; that the person from whom they bought the tobacco showed his samples with Charles Finke & Co.'s tag on them, each sample representing a case of tobacco :

" Q. Will you be kind enough to say what the custom of the trade is with reference to buying by tag? "

By Mr. Brown : It is objected to, because the narr in this case shows that the plaintiff's claim is founded upon an express contract, and custom or usage has nothing to do with it.

By the court : Objection overruled, question allowed; exception.[12]

" A. In buying or selling tobacco by sample, the seller shows the purchaser only the samples of the tobacco, not the cases. When the tobacco is sold, the samples are sold with the cases.

Statement of Facts.

The sample guaranteed is considered to go from the seller to the buyer with the case, to be used by him for re-selling the tobacco, in case he is a dealer. Tobacco is frequently sold by the same set of samples a number of times to different purchasers. Q. And the purchaser never sees the case? A. They never see the case; that is, not usually; they frequently do. Q. Is it customary to ship samples, and sell the tobacco by the samples in other cities without shipping the case itself? A. It is almost the universal method of selling tobacco, to show the samples, or send them away to other cities, and not to ship the case itself till after the sale has been made. Q. Then, what does this tag on here guarantee to the purchaser, if anything, in the trade?"

Objected to by the defendants' counsel. The tag has on its face the terms of the contract, and the usage of the trade cannot vary or alter it.

" Q. What does this tag mean in the trade?"

By Mr. Brown: The defendants' counsel specifically object on the ground that no usage or custom of the trade can vary the contract, even by implication, the usage or custom not having been incorporated into the contract.

By the court: Objection overruled, question allowed; exception.[13]

" A. It means that the sampler guarantees the tobacco in the case to be identical with the tobacco in the sample, and, unless the tag bears marks to the contrary, that the tobacco in the case is sound. It is the custom in sampling tobacco, when any damaged tobacco is found in the case, to mark on the ticket the percentage of damage that the case contains. The absence of marks indicates that the tobacco is sound. . . . . Q. When this tobacco is inspected, if you know, is it inspected for the benefit of the seller, or for the benefit of the trade at large, whoever may purchase, or for both parties?"

Objected to, by the defendants' counsel, on the ground that the tag on its face shows the character and nature of the warranty, it being as to the quality of the goods at the date of the inspection.

By the court: Objection overruled, question allowed; exception.[14]

" A. The tobacco is inspected for the convenience and safety of both seller and buyer. Frequently tobacco is sold by these

Statement of Facts.

samples and paid for long before it is delivered, the buyer in-
specting the samples. It is a guaranty of the condition of the
tobacco in the cases, and for the convenience of both parties the
tobacco is sampled, in order that the settlements may be made.
Frequently it is inconvenient for the buyer to remove the to-
bacco, and for the covenience of both buyer and seller the tobacco
is sampled. Q. What is the charge for inspecting a case of
tobacco? A. The charge varies from twenty-five to thirty-five
cents, in different firms. Q. How many firms are there that you
know of, engaged in inspecting tobacco? A. Three principal
firms. F. C. Lynde, Hamilton & Co., Charles S. Philips & Co.
and Charles Finke & Co."

The witness testified, further, that the understanding in the
trade was that the buyer holds the sampler responsible; that he
cannot hold the seller.

Other witnesses testified in like effect as to the usage of the
trade in respect of samples and tags, and one to the effect that
Mr. Ruscher, of the firm of Charles Finke & Co., had told him
that Mr. Irwin was one of their sampling agents at Lancaster.
And there was testimony tending to show that by the usage of
the trade the sampler's liability continued for six months after
the date of the sampling; also, that such had been the usage of
the trade for twenty years.

John D. Skiles, called for plaintiff, testified that he was a
dealer in leaf tobacco and paid about two thousand dollars a
year for sampling:

"Q. What benefit does it give you?"

Objected to by the defendants' counsel.

By the court: Objection overruled; allowed; exception.[15]

"A. We have our tobacco inspected by New York inspectors,
by Finke & Co., or Lynde & Co., simply because we can then
sell it all over the United States, and if there is any trouble
about it, we have good parties to fall back on. Q. Whom do
you fall back on? A. On the samplers."

By the court: "You have a sample to show? A. Certainly."

"Q. And they pay the party that holds the sample? A. I will
explain. I sell a hundred cases of tobacco to some party, and
it turns out to be partly damaged. He comes back and says,
there are half a dozen cases of that tobacco damaged; and I re-
port it to the inspectors, and they report it to the firm, and after

Charge of Court below.

this report they settle with the buyer.   Q.  With the person you
sell to?   A.  Yes, sir.   Q.  The tag on the sample is the guar-
anty of the tobacco all over the United States?   A.  The strip
or sample is supposed to represent the quality of the case, and
it is sold on that.   Q.  What do you pay for sampling tobacco?"
   Objected to.
   By the court:  Objection overruled; offer admitted; excep-
tion.[16]
   "A.  Thirty-five cents.   The labor we furnish; all the ex-
pense they have is to draw the sample and put the tag on."
   J. Gust. Zook, called by plaintiff, testified that he was a dealer
in leaf tobacco in Lancaster city:
   "Q.  State, if you know, what is the custom of the trade with
reference to a sample of tobacco with that tag upon it, and what
does it represent to purchasers?"
   Objected to by the defendants' counsel.
   By the court:  Objection overruled, question allowed; ex-
ception.[17]
   "A.  The tobacco is sampled for the purpose of selling by.
The sample is supposed to represent the case.   We sell entirely
by sample.   If I buy a lot of tobacco from a dealer, and the
tickets are not marked in any way, I would suppose the to-
bacco would be sound, and I would buy it as sound tobacco."
   The plaintiff admitted that B. S. Kendig & Co. had not yet
been paid for the tobacco.

   The case being closed on the evidence, the court, PATTER-
SON, J., charged the jury in part as follows:
   As we have said, the plaintiffs seek to hold the defendants,
Finke & Co., or their two agents, responsible for the loss.   In
the first place, you will inquire whether the plaintiffs in this
case did suffer any loss.   They maintain that they suffered a
loss of $206.11, by reason of the tobacco being inferior and
spoiled.   They maintain that the agents,—and I would not
call them that, if it had not been proved, but I will refer you
to the evidence of a witness in this case, that Mr. Ruscher ad-
mitted that he was one of the firm, and that these gentlemen,
named Schroeder and Irwin, were his agents,—that the agents,
after being informed of the spoiled condition of the tobacco,
told them, the parties, to separate it, and ascertain how much

of it was spoiled, and weigh it, and they would be responsible
for it.   They, of course, like many others, have a right to back
out of a bargain.   However, that will not bind them, unless
the law and the facts in this case bind them.   Well, they prove
before you, gentlemen, a loss of $206.11.   It was put by one
witness at $206.77.   That is not disputed.   It is not disputed
that that is the extent of the loss, and it is all that the plaintiffs
claim in this case to recover.   Can the plaintiffs recover under
the peculiar circumstances and testimony in this case ?   The
court will read the law to you first, and apply it in the course
of our charge, so that you will understand the terms used in
this case. . . . .

Now, from the evidence in this case, we will instruct you,
that if you are able to say this is a guaranty, that it is contin-
uous; it will bind the defendants.   It, the tobacco, came into
the hands of Kendig & Co.; it was sold by them to the plaint-
iff in this case, the Conestoga Cigar Co.; it continued from one
to another, it passed from one hand to another, with the sam-
ple by which this tobacco was sold; and that is a continuous
guaranty, provided that it is a guaranty at all.   A guaranty
may be for a single act, or it may be continuous.   And we in-
struct you that this guaranty, under the evidence, is continuous
from one hand to the other when it is sold. . . . .

Now, this is a peculiar question as you have heard.   It is
one of first impression.   It is so peculiar that we think that it
cannot be understood, this guaranty, without reference to facts.
But you look at the testimony in this case and consider that
the inspectors put their name on a tag like this; that they are
the inspectors, " Charles Finke & Co., Inspectors, 149 Water
street,·New York ; " Frank Ruscher and John T. Mellor, Jr.,
being a part of the company.   Frank Ruscher was one of the
gentlemen who was spoken to by Mr Forrest, and he admitted
that he was one of this firm.   Until that was shown, that these
gentlemen were actually not only members of the firm, but
that these agents, Mr. Irwin and Mr. Schroeder, were their
agents, I was going to nonsuit this case and turn these plaint-
iffs out of court; but they have brought that question of the
agency of Schroeder and Irwin down to the very defendants
themselves, namely, " Charles Finke & Co.," the very parties
that are on this tab and holding themselves out to the world as in-

Charge of Court below.

spectors of leaf tobacco, and what they put out designated what was in the case of tobacco.

[Now, what was the consideration that they received? The consideration is that they get a reputation in the market, not only in New York, as has been testified, but all over the world where their article is bought and sold, and that the owner of the tobacco pays the inspectors who are employed twenty-five and thirty-five cents a case, and the party that buys from them repays them, and so on, till it comes into the hands of the Conestoga Cigar Company.] [10]

[Now, I admit that this written tag does not go so far in explaining to what extent Charles Finke & Co. have bound themselves, if you just look at it. Indeed, they say, " Not responsible for any change or damage occurring after inspection." But that is not sustained by the evidence in this case. It carries, according to the evidence of all the witnesses who testified, six months after the inspection, and from what is written here I don't see why the law don't hold them for a year.] [11]     I will admit that by reading that you cannot alone from that and the guaranty that is to be in writing or printing, you cannot understand it all without reference to the facts, without reference to what the witnesses in this case have testified in order to explain it. Now, I was ignorant of the great magnitude of this tab in the trade, until the trial of this case, though I have tried a good many tobacco suits; yet I never had one of this nature. . . . .

The court is requested by the defendants to charge :

1. This action having been brought upon an alleged contract, and there being no evidence whatever of any contract between the defendants and the plaintiff, there can be no recovery, and the verdict must be for the defendants.

Answer : We deny that point of law.[1]

2. There being no evidence of any contract by the defendants with any person, to which the plaintiff was privy, there can be no recovery, and the verdict must be for the defendants.

Answer : We deny that point.   We refuse to affirm it.[2]

3. There being no evidence of a consideration of any kind inducing the defendants to have made or entered into any contract with the plaintiff, or with any other person, there can be no recovery, and the verdict must be for the defendants.

Charge of Court below.

Answer: We deny that point as being the law.[3]

4. Under the statement filed in this case, the plaintiff cannot recover, and the verdict must be for the defendants.

Answer: We refuse to affirm that point. We deny that point.[4]

5. Under the evidence in this case, the plaintiff cannot recover, and the verdict must be for the defendants.

Answer: We refuse to so charge you.[5]

6. Under the law as applicable to the facts of the case, as proved by the plaintiff, there can be no recovery in this case by the plaintiff, and the verdict must be for the defendants.

Answer: We deny that point. We refuse to affirm that point.[6]

The plaintiff requests the court to charge:

1. The warranty or guaranty which each sample of tobacco in controversy contained on the tags or labels which accompanied it with the defendants' names and seals thereon, runs with the tobacco thus sampled into whomsoever's hands it comes by purchase, and carries with it the beneficial interest of such warranty or guaranty to every such holder or purchaser acquiring it within six months from the date of such warranty or guaranty.

Answer: We say, yes; if you believe the testimony, it does thus carry with it a guaranty or warranty to every person who gets it.[7]

2. If the defendants held themselves out to the trade as inspectors of leaf tobacco, and as such inspectors put the tags or labels offered in evidence, containing the contract of warranty or guaranty to which their names were attached, on the stripped samples of leaf tobacco in controversy, and placed their seals on the same, said warranty or guaranty carries the beneficial interest to the plaintiff, the holder and purchaser of the same within six months from the date of such warranty or guaranty; and the verdict must be for the plaintiff, provided that the jury believe that the plaintiff purchased the tobacco upon the strength of these samples, and that it was damaged to the extent which the plaintiff's testimony has shown when purchased by it.

Answer: Yes. We affirm that point, provided you believe they have suffered, and provided you believe that the seal to which they refer is not a seal on the contract of guaranty, but

Arguments.

a mere seal to designate the inspectors ; and that is all it is, as Charles Finke & Co., in this case.   That is all that it is there for.   It is not to add more force and binding quality to the guaranty, but it is a mere designation.   We affirm that point with that understanding.[8]

3. The verdict of the jury must be for the plaintiff for whatever damages it has sustained by reason of said warranty or guaranty given by said defendants.

Answer : We say, yes, if the jury believe the evidence of the plaintiff, and believe the plaintiff suffered injury or loss on their ten cases of tobacco, inspected by Charles Finke & Co., and designated as their inspection by a tag attached to the sample of the said ten cases, and delivered to the plaintiff, that is, the Conestoga Cigar Co., on the delivery of said tobacco, and made part of the evidence in this trial.   If you believe that from the evidence, then we affirm that third point, that the verdict must be for the plaintiff.[9]

—The jury returned a verdict for the plaintiff for $229.69. Judgment having been entered, the defendants took this appeal and assigned for error :

1–6. The answers to the defendants' points.[1 to 6]

7–9. The answers to the plaintiff's points.[7 to 9]

10, 11. The portions of the charge embraced in [  ] [10] [11]

12–17. The admission of plaintiff's offers.[12 to 17]

*Mr. W. U. Hensel* and *Mr. J. Hay Brown*, for the appellants :

The alleged contract was utterly nudum pactum.   Indeed, there was no contract at all ; no contractual relation whatever, either alleged or proved, between the parties to this suit.   The testimony utterly failed to show that Charles Finke & Co. ever sampled or inspected this tobacco at all, for anybody, or that the tags bearing their stamp upon them were placed there by them, or by any one for them or under their authority ; that they had ever been paid anything by anybody for sampling or inspecting it ; or, that plaintiff had ever paid anybody anything for inspecting this tobacco, or for the tobacco itself.

1. Nothing is better settled than that " a party cannot recover unless on a duty assumed to himself : " 1 Whart. on Cont., §§ 237, 506, 507.   To support a contract, a consideration must move from the promisee : Edmundson v. Penny, 1

Arguments.

Pa. 335.   The person to sue must be the person from whom the consideration for the promise moves: Campbell v. Lacock, 40 Pa. 450; Torrens v. Campbell, 74 Pa. 475; De Bolle v. Insurance Co., 4 Wh. 67.   And granted, for the sake of the argument, that Charles Finke & Co. had actually sampled the tobacco and warranted its quality to be equal to the sample, had been paid for doing so, and had thus made a contract of insurance with the party who paid them, could they even then be held responsible to some third party to whom their promisee sold the goods, without any privity of Charles Finke & Co. to the new contract with the new party?   How could the sampler be held to answer to an entirely new party, introduced to the contract without his knowledge or consent; much less to every new purchaser of the tobacco, as it passes from hand to hand for six months?   But, in this case, not even such a state of facts exists.   No prior holder, purchaser, or vendor of the tobacco, is ever brought into contractual relations with the defendants.

2. But, even if Charles Finke & Co. sampled the tobacco for the plaintiff, or agreed to make good its deficiencies; or sampled it for some prior owner or holder of the tobacco, any warranty or insurance implied from such a sampling was, so far as the testimony shows, entirely without consideration.   Not a penny is shown to have been received by the defendants from the plaintiff, from its vendors, or from any one of the many persons whom the court, jury and counsel were left to imagine might have had this tobacco and had it sampled.   Without a consideration, a contract proved cannot be enforced.   Not only was there no contract, but the figment of a contract, woven out of the voluminous testimony, is without the remotest reference to a consideration.   No process can extract from the evidence, in this case, even a hint of any consideration ever paid to the defendants for the service in which they are alleged to have made the warranty.   And how could a contract between the later purchasers be extended back to parties not privy to it?

3. In an action upon an express contract, as was averred in the declaration in this case, all evidence to show such a contract being lacking, it will not be permitted to infer such a contract from proof of the usages of trade.   A usage must never contradict a rule of law; and such important and essen-

tial elements of a contract as the consideration and privity of the contracting parties, are not to be inferred from the usages of parties to contract between themselves and for a consideration. No usage can be incorporated into a contract which is inconsistent with the terms of the contract: 2 Pars. on Cont., 546. Finally, there could have been no legal recovery in this case, had all the elements hereinbefore set forth as lacking been supplied, in the face of the plaintiff's admission that it had as yet suffered no damage. The plaintiff had never paid its vendors for the tobacco. It has its remedy. If bad tobacco was bought on samples purporting it to be good, payment can be refused its vendors. And nothing has ever been done here to transmit to subsequent purchasers the rights which any unnamed sufferer may have acquired against the defendants: Blackb. on Cont. of Sale, Text Book S., *334. Without contractual relations, without privity, and without consideration, it seems impossible to maintain that there was here any contract that a court can enforce.

*Mr. T. B. Holohan* (with him *Mr. E. K. Martin*), for the appellee:

1. There is in the tobacco trade a class of persons who are known as samplers of leaf tobacco. It is their occupation and by it they make large sums of money. The leading firms in this business have a wide reputation for skilfully designating the quality of tobacco, and when they place their tag and seal upon a sample or samples drawn from a case, these designate the quality of the tobacco in the shape of a warranty. These warranties are called "samples" by the trade in that case. And it was proved by plaintiff that the trade had accepted this standard for twenty years, and that by the customs of the trade the warrantors of the samples have likewise recognized a liability to purchasers for the space of six months. Here, then, is an existing method of contracting, well defined and established by the customs of a particular trade ; and, having all the sanctity of a long- and well-known usage, it has become the law of that trade as absolutely as if it were spread on the statute books. Do the parties to this suit come within the terms of this intent and established usage?

2. By the appellants' admission Finke & Co. were a sampling

firm of New York city, with a branch office in Lancaster city. On February 5, 1887, Finke & Co. placed their sampling tag on the samples of tobacco in controversy, consisting of ten cases. This tobacco was sold by these samples, and passed from hand to hand, until it came into possession of the plaintiff within six months from the time of the sampling. If these tags of Finke & Co. meant anything, they meant what the trade understood them to mean, and what the words "stripped and sample warranted," printed across its face, intended them to convey, namely, that it was of the degree of soundness and fineness thereon indicated. Otherwise, it was a fraud and a cheat, and the thirty-five cents per case that had been paid for sampling was a deception, as the manual labor of sampling a case would not cost ten cents. Defendants claim that there was no subsisting contract between Finke & Co. and the plaintiff. If that is so, then the entire trade misunderstands the purposes for which sampling has been instituted, as the testimony of a number of old and reliable tobacco dealers proves.

3. The custom of leaf tobacco inspection, by regular inspectors, is universal throughout the United States. The defendants are residents of New York city, and hold themselves out as inspectors of leaf tobacco all over the United States, for which they are paid a large premium for their guaranty or warranty. The actual labor of the work of the sampling of the tobacco is furnished by the owner of the tobacco at the time of the inspection. A custom must be certain, uniform and notorious, so as to be known to the parties to the trade: McMasters v. Railroad Co., 69 Pa. 374; Carter v. Coal Co., 77 Pa. 286. Such a custom has written the law into the contract of these samplers, and the defendants and the plaintiff have both recognized, and have contracted upon the faith and with knowledge actual or constructive of such usage and custom. Reed v. Garvin, 12 S. & R. 103, holds "that the guaranty ran with the bond, and into whomsoever's hands it came, the beneficial interest in the bond carried with it the guaranty of payment." Here the guaranty or warranty on the tag ran with the tobacco into whomsoever's hands it came, and the beneficial interest conveyed by the terms on the tag of Finke & Co., the defendants, ran with the tobacco; and they guaranteed and warranted, by the custom of the trade, over a period of six months, and previously acknowledged the validity of the custom by paying similar demands to the one in suit.

OPINION, MR. CHIEF JUSTICE PAXSON:

This case presents a novel question. It is whether a tag placed upon a bale of tobacco by the inspector or sampler is a warranty of the quality of the tobacco, and whether it enures to the benefit of subsequent purchasers thereof.

The facts, briefly stated, are as follows: The Conestoga Cigar Co., plaintiff, is a corporation engaged in the manufacture of cigars in Lancaster, Pa. Charles Finke & Co., defendants, are engaged in what is known as "sampling" of leaf tobacco, with their main office in the city of New York, and an agency or branch office in the city of Lancaster. In the regular course of business, the plaintiff purchased ten cases of tobacco from the firm of B. S. Kendig & Co. These cases were purchased by sample, each sample having on it one of defendants' tags, containing such an inscription as the following, the number, weight, and tare varying with the different cases:

"Stripped and sample warranted: No. 408. Feb. 5th, 1887. 484 lbs. and 84 off. Not responsible for any change or damage occurring after inspection. Charles Finke & Co., Inspectors, 149 Water Street, New York. Frank Ruscher; John T. Mellor, Jr."

Shortly after the purchase of the tobacco, a portion of it, 1973 lbs., was found to be injured. The plaintiff immediately notified Kendig & Co., from whom it purchased it; and the latter notified the defendants, whose tag was on the samples. Shortly thereafter the agents of Finke & Co. called upon the plaintiff, examined the defective tobacco, and promised to make it all right, and pay for it. The defendants subsequently failed to "make it all right," and this suit was brought to compel them to do so.

The plaintiff was met at the very threshold of its case with the contention that there was no contract between the parties, nor was there any privity. It may be conceded that no contract with the plaintiff appears upon the face of the tag, nor was there any evidence to show that the defendants had sampled the tobacco at the request of the plaintiff, or that it had paid them for doing so. On the contrary, it was evident that it had been sampled for some previous owner, and had passed, thus sampled, to the plaintiff.

Had there been no ambiguity about the tag, its construc-

Opinion of the Court.

tion would have been for the court. As, however, it was unintelligible in some respects without explanation, the learned judge below permitted the plaintiff to call a number of witnesses, inspectors, and persons in the tobacco trade, to testify to the meaning of certain words and figures on the tags, as understood and acted upon by those engaged in the business in this country. The uncontradicted evidence upon this point was, in substance, that the tag or label on the sample means that the sampler guarantees the tobacco in the case to be identical with the tobacco in the sample, and, unless the tag bears marks to the contrary, that the tobacco in the case is sound; that it is the custom in sampling tobacco, when any damaged tobacco is found in the case to mark on the ticket the percentage of damage that the case contains; that the absence of marks indicates that the tobacco is sound; that it is inspected for the convenience and safety of both buyer and seller; that the tobacco sold by these samples is frequently paid for long before it is delivered; that the label is not only a guaranty of the quality of the tobacco, at the time of inspection, but that the guaranty is good for six months, for the benefit of any person into whose possession the tobacco may come within that time; that, if the tobacco thus inspected proves defective, the sampler shall make it good by paying for so much as is injured or spoiled. There is no doubt, under the evidence, that this is the usage of the trade, so general as to be universal. Whether the usage has continued so long as to have grown into a custom such as the law would write into every such contract, is a very serious question which we are not called upon to rule in this case. As it is one of first impression, and at the same time of vast importance to this large industry, we prefer to decide only what is before us, and not anticipate cases which may arise in the future under other circumstances.

We are of opinion that the evidence explanatory of the tag, and the usage of trade in connection therewith, was properly received and submitted to the jury. Their verdict settles the matter, so far as the facts are concerned. They have found the contract substantially in accordance with the plaintiff's construction of it. Was there evidence sufficient to justify this finding?

However much we might hesitate, were there nothing in the

case but the proof of the usage of the trade, there is evidence that the defendants' own construction was in harmony with that usage. It is in proof that defendants' agents, when notified of the defect in the tobacco, called upon the plaintiff, examined it, admitted the defect, and promised to make it good. There was also evidence that in other cases, when the same thing had occurred, they had "made it good" by paying for the defective tobacco. It is no answer to this to say that there was no proof of their agency, or that the tags were placed on the samples by the defendants. It was not only shown that Irwin and Schroeder were acting as agents for the defendants, but there was direct proof of their agency by the admission of a member of defendants' firm. There was also the recognition of the sample tags by the agents, accompanied by the promise to pay for the defective tobacco. We have, then, the construction of the contract by the defendants themselves ; a construction in entire harmony with that of the plaintiff, and the usage of trade which was offered in explanation of it. The case was submitted to the jury with proper instructions, and the verdict was fully warranted by the evidence.

Judgment affirmed.